Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John A. Nordberg | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 2568 | **DATE** | 9/26/2002 |
| **CASE TITLE** | Flood vs. Long Term Disability Plan, et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter memorandum opinion and order. For the foregoing reasons, plaintiff's motion for summary judgment is granted and defendants' cross-motion for summary judgment is denied. All other pending motions are stricken as moot. The parties are directed to appear at a status hearing on October 23, 2002 at 2:30 p.m. to discuss the remaining issues in this case. (19-1)

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | **Document Number** |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | SEP 27 2002 | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | CDY | 22 |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| TP | courtroom deputy's initials | | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| CHARLENE MARIE FLOOD, | ) |
| Plaintiff, | ) |
| | ) No. 00 C 2568 |
| | ) No. 01 C 1610 |
| v. | ) |
| | ) Judge John A. Nordberg |
| LONG TERM DISABILITY PLAN FOR FIRST DATA CORPORATION, and CONTINENTAL CASUALTY COMPANY, | ) |
| Defendants. | ) |

**DOCKETED**

**SEP 27 2002**

## MEMORANDUM OPINION AND ORDER

Before the court are cross-motions for summary judgment. This is an ERISA case challenging an administrator's decision to deny long-term disability benefits. For the reasons stated below, we grant summary judgment in favor of the plaintiff.

## BACKGROUND

Plaintiff Charlene Marie Flood worked as Vice President of sales for First Data Corporation from April 6, 1998 until May 4, 1999 when she stopped working after experiencing a severe panic attack. Soon thereafter, she began seeing a psychologist (Dr. Wynkoop) and a psychiatrist (Dr. Handrup) both of whom diagnosed her with "Major Depression with Anxiety." Plaintiff remained out of work over the next three months as she continued to see her doctors, participating in weekly therapy sessions and taking Prozac and Ativan for her condition.

-1-



On July 27, 1999, plaintiff applied for long-term disability benefits. She was a participant in the company's long-term disability plan ("LTD Plan"), which consisted of a long-term disability insurance policy written by defendant Continental Casualty Company, a CNA Company ("CNA").[1] Plaintiff submitted an application to CNA who was the administrator of the LTD Plan. Under the terms of the policy, plaintiff had to show that she was totally disabled, which meant that she could not perform the substantial and major duties of her occupation and that she had been "continuously disabled" throughout the 90-day elimination period, which in her case ran from May 4, 1999 until the date of her application on July 27, 1999.

On August 24, 1999, a psychiatric nurse case manager for CNA (Lissa Estes) interviewed plaintiff and took written notes of plaintiff's symptoms.[2] At the request of CNA, plaintiff had her two doctors submit a "Physician's Interview for Psychiatric Case Manager." Dr. Wynkoop submitted his report on August 30, 1999 and Dr. Handrup submitted his report on September 16, 1999.

In a letter dated September 27, 1999, Frank Martinko told plaintiff that CNA was denying her claim because she was not continuously disabled through the 90-day elimination period.

---

[1] The policy constitutes an "employee welfare benefit plan" as defined by ERISA.

[2] Estes wrote down the following summary of plaintiff's description of her symptoms: "could fall asleep instantly but then I would wake up a couple of hours later full of angst and couldn't get back to sleep, couldn't breathe, restless, couldn't get enough air in my lungs. Felt like I was dying. Since I've learned about anxiety, they said I was having a panic attack. Had never experienced before so I didn't know what was going on. There are still things that bring up anxiety, but now that that is more under control, the depression was underneath. Think it is the depression underneath that is making this a longer term. Once I was removed from the source of the anxiety I felt better." (Defs. St. of Facts No. 17.)

Martinko stated that plaintiff's condition had improved during the 90-day period such that she was not disabled for part of the time.

Plaintiff, through her attorney, then filed an appeal that was considered by a CNA Appeals Committee led by Robert Troxell. In a letter dated March 13, 2000, the Committee upheld the denial of benefits. As explained in the letter, the Committee based its decision on two rationales. First, it relied on the original reason cited in the Martinko letter; namely, plaintiff was not continuously disabled during the elimination period. Second, the Committee concluded that plaintiff, although unable to return to her job at First Data, was able to perform the substantial duties of her occupation for another employer.

The Appeals Committee based its decision on an "Independent Peer Review" by psychologist Charles W. Paskewicz, who reviewed the records submitted to CNA but did not examine plaintiff nor speak with her treating doctors.

Dr. Paskewicz actually issued two reports – one dated March 9th and one dated March 10th. In the first report, Dr. Paskewicz indicated that the evidence showed that plaintiff, in fact, was continuously disabled during the 90-day period just as her two treating doctors had claimed. After receiving this first report, CNA asked Dr. Paskewicz to consider whether plaintiff was able to work at her occupation for another employer. In his second report, issued the next day, Dr. Paskewicz concluded that plaintiff's difficulties in working were "work-site specific," meaning that he believed she could work for another employer.

Over the next year and a half, plaintiff attempted to challenge this decision but CNA stuck to its position. On April 28, 2000, plaintiff filed a complaint in this court, seeking review of the decision (Case No. 00 C 2568). Before reaching the merits, we remanded this case back to

CNA for a redetermination because plaintiff never received copies of the two Paskewicz reports nor the Estes report that CNA had used in its original administrative review. *See Flood v. Long Term Disability Plan for First Data Corp.*, 2000 WL 1672319 (N.D. Ill. Nov. 3, 2000).[3]

Plaintiff's counsel then submitted further evidence of her disability and CNA again denied the claim. In April 2001, the Social Security Administration held that plaintiff qualified to receive disability insurance benefits. Plaintiff notes that this finding shows that she was unable to "engage in any substantial gainful activity." 42 U.S.C. Sec. 423(d)(1)(A). After waiting to get various documents from the SSA, plaintiff filed another action in this court on March 7, 2001 (Case No. 01 C 1610), which was later consolidated with Case No. 00 C 2568.

## DISCUSSION

### I. Standard Of Review.

The first question is the standard of review. Plaintiff argues that we should review the administrator's decision *de novo* while defendants argue that we should review it under the arbitrary and capricious standard. This question is important, perhaps even outcome-determinative as there is a big difference between the two standards. As Judge Posner noted in *Herzberger v. Standard Ins. Co.*, 205 F.3d 327 (7th Cir.2000), the arbitrary and capricious standard means that the administrator's decision is "largely insulated from judicial review by reason of being discretionary." *Id.* at 332. In contrast, under the *de novo* standard, we look at all the evidence and may reverse the administrator's decision if we think it is "merely incorrect." *Id.* at 329. Not only is this question important, it is one with no direct answer available from the Seventh Circuit.

---

[3]Plaintiff was diagnosed with breast cancer in May, 2000.

-4-

In *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989), the Supreme Court held that the default standard for reviewing a denial of benefits is *de novo* review. This standard applies unless the benefit plan gives the administrator "discretionary authority" to determine eligibility for benefits or to construe the terms of the plan.

After *Firestone*, the appellate courts attempted to determine what type of specific language was sufficient to show that the administrator had discretionary authority to warrant application of the deferential standard. Courts struggled with language stating that the insured must provide "due written proof" or "satisfactory proof." Although some appellate courts initially found this language acceptable, the clear recent trend is that it is not enough. In fact, according to one commentator, the Sixth Circuit now seems to be the only circuit "willing to construe satisfactory proof language as authorizing discretion." *See* Kathryn J. Kennedy, "Judicial Standard of Review in ERISA Benefit Claim Cases," 50 Am. U. L. Rev. 1083, 1126 (2001). The Seventh Circuit weighed in on this issue in *Herzberger* and held that this type of "satisfactory proof" language is not enough by itself to take the case out of the *Firestone* default standard of *de novo* review.

The parties here agree that the language used in the plan document ("due written proof") is exactly the type of language that the Seventh Circuit in *Herzberger* said was inadequate by itself to confer discretion.[4] The wrinkle in this case concerns the effect of the summary plan

---

[4]The relevant provision in the Plan states: "Benefits will be paid weekly, bi-weekly, semi-monthly, or monthly, whichever applies, immediately after [CNA] receive[s] due written proof of loss."

description ("SPD"). It is undisputed that, in contrast to the plan document, the SPD states that the plan administrator does have the requisite discretion.[5]

The parties disagree on how to reconcile these two provisions. Plaintiff argues that there is a conflict between the two. Relying on *Health Cost Controls of Illinois, Inc. v. Washington*, 187 F.3d 703, 711 (7th Cir. 1999), plaintiff states that the terms of the plan control when there is a conflict with the SPD. Given that the plan language is insufficient under *Herzberger*, plaintiff believes that this language trumps the SPD's clear language.

Defendants argue that the there is not really a conflict. They argue that the plan language, while falling short of the explicit language required by *Herzberger*, is nonetheless consistent with the grant of discretion. Defendants then argue that this "almost enough" language becomes enough when augmented by the clear language of the SPD. In short, the defendant argues that the SPD tips the balance and clarifies the ambiguous language in the plan.

Both sides make reasonable arguments and it is a close question. In an opinion issued after the briefs were filed, Judge Kocoras confronted this precise issue in a case involving CNA and exactly the same facts as this case. *Akhtar v. Continental Casualty Co.*, 2002 WL 500544 (N.D. Ill. April 1, 2002). He concluded that the *de novo* standard should apply in this context based on the following reasoning:

> The language of the plan is what controls; a summary plan description cannot be used to expand discretion given under [a] plan. *See, e.g., Health Cost Controls of Illinois, Inc. v. Washington*, 187 F.3d 703, 711 (7th Cir. 1999). In this case, CNA argues that the language of the plan, requiring "due written proof" of a loss, when read in conjunction with the language of the summary plan description, confer the

---

[5]The SPD states: "The insurance company has the exclusive right to interpret the provisions of the plan, including questions regarding eligibility and all questions regarding payment of any benefit amounts." (SPD at 63.)

> discretion needed to justify an arbitrary and capricious standard of review. However, in light of applicable Seventh Circuit case law, we cannot read these two documents in conjunction. There is no substantive difference between the "due written proof" required by CNA's plan and the "satisfactory written proof" that was held insufficient to grant discretion in *Health Cost Controls*. In addition, the language of the summary plan description states that the information it contains is not a part of the policy itself. (R. 56). The language of these two documents is therefore in conflict. Because the language of the two documents conflict, the SPD cannot be considered to supply the discretion that is not found in the language of the plan. We therefore review CNA's decision de novo.

*Id.* at *4. Although this decision is not binding on us, we are persuaded by its reasoning and agree with its conclusion and therefore will apply the default *de novo* standard in this case.

## II.     Applying This Standard To The Facts Of This Case.

Having decided that the standard of review is *de novo*, we will now examine the administrative record to determine whether either of CNA's two rationales for denying plaintiff's claim was correct. *See Herzberger*, 205 F.3d at 329.[6]

CNA's first rationale for denying the claim is that plaintiff's condition improved during the three-month elimination period. This conclusion was initially formed by a CNA nurse named Lissa Estes and then was later adopted by CNA as its initial rationale. Estes interviewed plaintiff on one occasion and reviewed the therapy notes made by plaintiff's two treating doctors and concluded that plaintiff's condition had sufficiently improved as of June 24, 1999. Estes pointed

---

[6]As a preliminary matter, we note that both sides have filed motions for summary judgement. In her opening brief, plaintiff asserted that this case could be resolved either under the summary judgment standard or alternatively with findings of fact under Rule 52. In their response briefs, defendants offered no objections to either procedural option. Because there is no real dispute regarding the underlying historical facts, we will evaluate this case under the traditional summary judgment standard, although we think that the result would be the same under the Rule 52 approach. On a related point, plaintiff has submitted additional evidence from the proceeding before the Social Security Administration. Defendants object to such evidence because it was not available at the time CNA made its decision and ask that we only consider the administrative record. We agree and therefore will not consider this newly submitted material.

to various comments made in the doctors' notes. One of the most prominent comments is the following comment made by Dr. Wynkoop on June 24th: "Client was euphoric when discussing her Avon walk against breast cancer, in which she walked 60 miles in 3 days. She felt great comraderie with her fellow walkers and a great sense of accomplishment." CNA also relies on various other comments such as plaintiff's comment that she wondered whether her night sweats "may be" attributable to menopause and a comment that she felt better after taking Prozac.

Having reviewed the entire administrative record, we are unconvinced by this rationale. It goes against the conclusions reached by both of plaintiff's treating doctors – a psychiatrist and a psychologist – who concluded that plaintiff was continuously unable to work during the elimination period. They both agreed that plaintiff suffered from major depression with anxiety, as well as panic attacks, and defendants have never questioned the validity of this diagnosis. Moreover, unlike nurse Estes, these two doctors had the advantage of seeing plaintiff in person on multiple occasions over an extended period of time. They spent significant amount of time with plaintiff and were able to ask questions and conduct tests. Dr. Wynkoop, for example, administered a MMPI-2 personality test at one point and concluded that it was consistent with major depression and anxiety. Estes, on the other hand, only talked to plaintiff on one occasion and never talked to either of her doctors.

As to the general assertion that plaintiff improved over the three month period, both her doctors noted that she made some improvements over the course of therapy but they still believed that she remained anxious and depressed and needed to continue in therapy. For example, Dr. Wynkoop stated at one point that plaintiff had a "[d]epressed mood, previously severe but now moderate. Anxiety, still severe but less so than when first seen." (Pls. Ex. G at 137.) As this

-8-

comment reflects, it is not illogical to believe both that plaintiff had improved somewhat and that she was still disabled under the policy definition. A patient's condition may vacillate somewhat from day to day and week to week just as a person's mood may fluctuate but, at the same time, still not cross below a minimum threshold.[7]

What is most striking about CNA's position is that it ignores the fact that the psychologist hired by CNA specifically rejected this rationale. In his March 9th report, Dr. Paskewicz specifically stated that the "available medical evidence shows <u>no</u> credible evidence that claimant was <u>not</u> totally and continuously unable to work throughout the elimination period." (Pls. Ex. N at 071; emphasis in original.) So not only did both of plaintiff's own doctors agree that she was disabled, the expert hired by CNA also agreed with this conclusion and did so in strong fashion stating that there was "no credible evidence" to support CNA's position. Despite this fact, CNA still takes the position before this court that plaintiff was not continuously disabled. This is not a persuasive argument. *See generally La Barge v. Life Ins. Co. of N. Am.*, 2001 WL 109527, *9 (N.D. Ill. Feb. 6, 2001) (noting that "a report of a non-examining, non-treating physician should be discounted when contradicted by all other evidence in the record").

CNA has a second rationale – one that was not advanced initially but that came to the surface after Dr. Paskewicz disagreed with CNA's initial rationale. As noted above, after Dr. Paskewicz submitted his first report to CNA on March 9th, CNA asked him to consider a second

---

[7]Specifically regarding plaintiff's comment that she felt euphoric after a charity walk for breast cancer, Dr. Wynkoop stated that the effect "was in fact quite temporary and the anxiety and depression did return." (Pls. Ex. S at 039.) Moreover, he stated that such a walk was a low stress situation that did not involve any mental challenges, thus suggesting that it was not a good indicator of her ability to return to the workplace.

rationale. He did so the next day, issuing a one-page letter report concluding that plaintiff, although not able to return to work at First Data, was capable of working for another employer.

Although this rationale at least has the benefit of having a psychologist stand behind it, it is still not very persuasive. As an initial matter, the fact that CNA came up with this rationale only after Dr. Paskewicz disagreed with their first rationale raises suspicion. Putting that side, the rationale has only marginal evidentiary support.

In particular, Dr. Paskewicz's opinion suffers from many of the same informational disadvantages inherent in Nurse Estes's report. He never interviewed plaintiff either on the phone or in person and never talked to either of the treating doctors. This fact, while not dispositive by itself, is nonetheless significant and imposes a higher hurdle for CNA to overcome. To the extent that there is a conflict regarding a medical opinion, most people would tend to side with the doctor who actually examined the patient. *See La Barge*, 2001 WL 109527 at *9. Not only did Dr. Paskewicz not interview the patient, he submitted a very brief and conclusory report (only three paragraphs) that does not cite to or quote from the specific evidence he relied upon.

As to the substance of the report, Dr. Paskewicz concluded that plaintiff "does not have disabling panic attacks except when working in her present work environment [or] thinking about working in that same environment." Although it is true that there are several comments in the therapy notes suggesting that plaintiff experienced a lot of stress at work, these notes also indicate that she experienced stress elsewhere. For example, plaintiff cited to various family conflicts and specifically discussed a family reunion she attended and a conflict with one of her sisters. The fact that plaintiff's condition exhibited itself primarily at work is neither surprising

nor particularly illuminating by itself. Work is often the primary stress point for many people and it would not be unnatural for her anxiety and panic attacks to manifest themselves more often under the strain of the workplace rather than at home.

The critical question is whether this workplace stress was unique to First Data. On this point, Dr. Paskewicz stated: "Thus, her inability to work at her current job is work-site specific. It is related to what was described as extreme pressure as well as insensitivity from the employer in relationship with her passive and dependent personality traits which did and currently do not allow her to relax and/or assert herself enough to cope with that particular job site." It is true that there are comments in the therapy notes stating that plaintiff believed her employer did not respect boundaries, showed "extraordinary lack of concern" for its employees, and had "extremely unrealistic expectations." Yet it is not clear whether the demands and pressures at First Data were the types of demands and pressures typical in this occupational field or whether they were out of the mainstream.[8] Dr. Paskewicz's report fails to consider the fact that almost any job will exert some pressures and demands.[9] Moreover, Dr. Paskewicz also concluded that part of the problem was not simply pressure from First Data but also the fact that plaintiff had "passive and dependent personality traits which did and currently do not allow her to relax and/or assert herself." These "traits" presumably would not go away if she worked at another job. Thus, even under Dr. Paskewicz's view, the allegedly onerous demands of this particular company were not the sole cause of plaintiff's stress on the job.

---

[8] No evidence has been submitted to substantiate that First Data in fact did exert – in the words of Dr. Paskewicz – "extreme pressure" on its employees.

[9] At the time, plaintiff's monthly wages were $12,083.

-11-

Again, it is worth noting that Dr. Paskewicz, like Nurse Estes, relied on various comments made by plaintiff's two treating doctors and that these two doctors specifically concluded that plaintiff's condition did disable her from working for other employers. For example, in a letter dated December 7, 2000, Dr. Handrup stated that he "strongly disagree[d]" with any conclusion that plaintiff could work at another position: "[a]fter careful perusal of her case, it is my considered professional opinion that Ms. Flood is incapable of handling any job or position wherein a high level of stress is an integral factor. This restriction is applicable not only for the present but for the foreseeable future due to the severity of her psychiatric condition." (Pls. Ex. Q at 047.)

In sum, having reviewed the entire record, we are not persuaded that either rationale advanced by CNA justified denial of plaintiff's claim for long-term disability benefits. We therefore grant summary judgment in favor of plaintiff. Plaintiff has requested a judgment awarding disability payments at a rate of 66 2/3% of her salary for a period of 24 months starting from August 1999; prejudgment interest at a rate of 9%; and attorneys' fees and costs pursuant to 29 U.S.C. Sec. 1132(g). Because defendants did not address these particular issues in their summary judgment briefs, we will refrain from entering a specific award at this time so that the parties can first meet and confer to see if they can resolve these issues without the benefit of further briefing. The parties are directed to appear at a status hearing (at the time set forth below) to report on their progress. At that time, if necessary, we will set a briefing schedule on any remaining disputed issues and then will issue a final order.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment is granted and defendants' cross-motion for summary judgment is denied. All other pending motions are stricken as moot. The parties are directed to appear at a status hearing on October 23, 2002 to discuss the remaining issues in this case.

ENTER:

_____
JOHN A. NORDBERG
Senior United States District Court Judge

DATED: September 26, 2002